# EXHIBIT B

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   ------------------------------------X
     KRISTEN MERONE,
 4
                                 PLAINTIFF,
 5
 6         -against-             Case No.:
                                 1:24-cv-08730
 7
 8   THE CITY OF NEW YORK, DANIEL G. GARCIA,
     ROBERT A. HAKIUS, MATTHEW T. BRUCATO,
 9   EDWARD P. SCIARRILLO AND JOHN and JANE DOE
     1-10,
10
                                 DEFENDANTS.
11   ------------------------------------X
12
13              DATE: MAY 23, 2025
14              TIME: 10:05  A.M
15
16
17         DEPOSITION of the Defendant,
18   P.O. MATTHEW J. BRUCATO, taken by the
19   Plaintiff, pursuant to a court order and to
20   the Federal Rules of Civil Procedure, held
21   electronically via ZOOM, before Susan M.
22   Lanzetta, a Notary Public of the State of
23   New York.
24
25
```



```
                                                    Page 14
 1                    PO BRUCATO
 2        Q.    Where you were the claimant?
 3        A.    Yes.
 4        Q.    Have you ever testified at a
 5   deposition in connection with your
 6   employment with the New York City Police
 7   Department?
 8        A.    No.
 9        Q.    Were you working on January 14,
10   2022?
11        A.    Yes.
12        Q.    And what was your detail on
13   that day?
14        A.    Sector David.
15        Q.    And did you respond to a call
16   at 14 Wadsworth Avenue in Staten Island?
17        A.    Yes.
18        Q.    What was the basis of that
19   call?
20        A.    It was a 52 family dispute.
21        Q.    Can you explain what a 52
22   family dispute is?
23        A.    It's a domestic dispute.
24        Q.    And how did you receive that
25   call?
```

```
                                              Page 15
 1                  PO BRUCATO
 2         A.    Via radio.
 3         Q.    And were you working that day
 4   alone or with a partner?
 5         A.    I was with a partner.
 6         Q.    Were you in a regular RMP at
 7   the time you received that call?
 8         A.    Yes.
 9         Q.    And when you responded to 14
10   Wadsworth Avenue, did you engage your
11   lights and sirens?
12         A.    Yes.
13         Q.    And you had your body-worn
14   camera on you, as we established, and
15   filming that day?
16         A.    Correct.
17         Q.    Prior to reviewing that
18   footage, did you have any independent
19   recollection of the incident we're here to
20   talk about?
21         A.    Yes.
22         Q.    What did you remember?
23         A.    It was really cold out that
24   night and just kind of the basic nature of
25   the job.
```

```
                                              Page 16
 1                    PO BRUCATO
 2        Q.    Did you say the basic nature of
 3   the job?
 4        A.    Yes.
 5        Q.    Specifically did you remember
 6   anything else?
 7        A.    No.
 8        Q.    Approximately what time did you
 9   arrive at 14 Wadsworth?
10        A.    Approximately 22:20.
11        Q.    And immediately upon arriving
12   at the scene, you were told -- were you
13   told that Ms. Merone suffered from some
14   mental illness?
15        A.    Not immediately on scene, no.
16        Q.    How long were you on scene
17   until you were told that?
18        A.    Several minutes.  Maybe a
19   minute.
20        Q.    Somewhere between one and five
21   minutes, is that fair to say?
22        A.    I would say so.
23        Q.    So pretty soon after your
24   arrival on the scene you were told that Ms.
25   Merone had some mental health issues, is
```

```
 1                     PO BRUCATO
 2   that fair?
 3        A.     Correct.
 4        Q.     And were you told that before
 5   any of your interactions with Ms. Merone?
 6        A.     Yes.
 7        Q.     How did that information factor
 8   into your plan or your approach for that
 9   evening?
10        A.     I'm sorry.  Can you rephrase
11   that.
12        Q.     When you received -- first,
13   I'll ask who did you get that information
14   from?
15        A.     I believe it was her
16   ex-boyfriend at the time.
17        Q.     So after you were told that Ms.
18   Merone had suffered from some mental
19   illness.  What did you do with that
20   information?  Did that factor into the way
21   you were going to approach the scenario in
22   any way?
23        A.     Yeah, it would factor into the
24   situation.
25        Q.     How so?
```



```
                                              Page 82
 1                 PO BRUCATO
 2   force to get somebody to the hospital?
 3        A.    Like I said, it's all
 4   circumstantial, it really depends on the
 5   situation.
 6        Q.    Can you think of a specific
 7   situation.
 8        A.    Not off the top of my head.
 9        Q.    Let's go to the definition
10   section of this Patrol Guide section.  It
11   defines emotionally disturbed person as a
12   person who appears to be mentally ill or
13   temporarily deranged and is conducting
14   himself in a manner which a police officer
15   reasonably believes is likely to result in
16   serious injury to himself or others.
17              Was Ms. Merone acting in a
18   manner that you reasonably believed her to
19   likely result -- that would likely result
20   in serious injury to herself or to others?
21        A.    To herself, yes.
22        Q.    You are testifying now that she
23   was acting in a manner that risked serious
24   injury to herself?
25        A.    Well, given the fact that she
```

```
                                                         Page 83
 1                    PO BRUCATO
 2   was outside herself all day from 10 a.m.
 3   onward and it was approximately twenty
 4   degrees outside, it's very well possible,
 5   yes.
 6         Q.    I'm not asking if it's very
 7   well possible.  I'm asking if you
 8   reasonably believed that she was acting in
 9   a manner that was likely to result in a
10   serious injury to herself or others?
11              MR. KALMBACH: Objection.
12         A.    Yes.
13         Q.    So are you changing your
14   previous testimony?
15              MR. KALMBACH: You can answer.
16         A.    So previously I testified to if
17   she would physically harm herself if
18   throwing herself off the balcony or using a
19   weapon.
20         Q.    Did I ever ask you specifically
21   if she was going to throw herself off the
22   the balcony or use a weapon?
23         A.    No.
24         Q.    So after reviewing the
25   definition of an emotionally disturbed
```